**UNITED STATES ex rel. Nathaniel WILLIAMS, Petitioner-Appellant,**

**v.**

**J. E. LaVALLEE, Warden of Clinton Correctional Facility, Dannemora, N. Y., Respondent-Appellee.**

No. 132, Docket 73–1720.

United States Court of Appeals, Second Circuit.

Argued Sept. 20, 1973.

Decided Nov. 20, 1973.

Certiorari Denied April 1, 1974.
See 94 S.Ct. 1622.

Barry H. Garfinkel, New York City
(Josephine Lea Iselin, New York City,
of counsel), for petitioner-appellant.

David R. Spiegel, Deputy Asst. Atty.
Gen. (Louis J. Lefkowitz, Atty. Gen. of
N. Y., Samuel A. Hirshowitz, First Asst.
Atty. Gen., of counsel), for respondent-
appellee.

Before KAUFMAN, Chief Judge, and
SMITH and MULLIGAN, Circuit
Judges.

### J. JOSEPH SMITH, Circuit Judge:

This is an appeal from denial of a pe-
tition by a state prisoner for a writ of
habeas corpus in the United States Dis-
trict Court for the Southern District of
New York, Irving Ben Cooper, *Judge*.
We find error and remand for hearing.

Perhaps the most difficult aspect of
this case is the circumstance that its
critical events occurred either before or
during what can fairly be called a revo-
lution in the rights of the indigent ac-
cused. Fortunately, recent legislative
and judicial rules insure that criminal
defendants receive the full panoply of
constitutional rights. Accordingly, cases
such as this, in which denials of the
most fundamental rights are alleged, are
largely confined to collateral attacks on
trials conducted years ago. Neverthe-
less, when confronted with one of these
anachronistic cases, a reviewing court
must make certain that the accused was
afforded all of the rights to which he
was then entitled—even those which
may not have been fully articulated until
after his opportunity to invoke them.
Because we believe the record in this
case does not clearly demonstrate that
petitioner was aware of all of his rights,
we find it necessary to remand for a
further hearing.

Petitioner Nathaniel Williams was
convicted of four counts of rape in New
York State Supreme Court, New York
County, on March 19, 1965. On May 10,
1965, he was sentenced by the trial
judge, The Honorable Charles Marks, J.
S. C., to a prison term of ten to twenty
years. At the time of his sentencing,
Williams was not advised by the court
that he had a right to appeal his convic-
tion *in forma pauperis*, that a notice of
appeal had to be filed within thirty
days, or that he had the right to ap-
pointed appellate counsel. As we shall
discuss below, this absence of notice was
the standard procedure in the New York
courts in 1965. Even indigent defend-
ants were not informed of their appel-
late rights or of how to exercise them.
Rather, the prevailing law put the obli-
gation to 'so inform a convicted defend-
ant on the individual's trial counsel.[1]

1. Appellant cites the 1968 version of what is
now 22 New York Codes, Rules and Regula-
tions § 606.5. In relevant part, the 1968
version provides:
Where there has been a conviction after
trial or otherwise . . . it shall be
the duty of counsel, retained or assigned,
and of the public defender, immediately
after the pronouncement of sentence
. . . to advise the defendant in
writing of his right to appeal, the time
limitations involved, in the manner of in-
stituting an appeal and of obtaining a
transcript of the testimony, and of the
right of a person who is unable to pay the
cost of an appeal to apply for leave to ap-
peal as a poor person. It shall also be
the duty of such counsel to ascertain
whether defendant wishes to appeal and, if
so, to serve and file the necessary notice
of appeal.
Rules of the Supreme Court, Appellate Divi-
sion, First Department, Pt. 7, Rule
V (2) (A) (1968).
In his brief, appellant states that an ear-
lier version of this rule was in effect when
Williams was sentenced in 1965. However, ·
a review of prior compilations of the rele-

In this case, that appears to have been an exceedingly poor choice. At trial, Williams had been represented by an attorney retained by his wife, one John R. Sanders. Just prior to his sentencing, Sanders informed Williams, who was indigent,[2] that an appeal of his conviction would cost seven thousand dollars. Thereafter, contrary to all legal ethics, Sanders abandoned Williams entirely.[3] We must base this sordid account of legal malfeasance on the testimony of petitioner, since Sanders was subsequently disbarred for other unrelated unethical conduct, left the state, and could not be produced to testify.[4]

In opposing this application for a writ of habeas corpus, which would do no more than restore Williams' right to appeal, the state stresses his admission that within two days of his sentencing a fellow inmate advised him of his right to appeal, in the words of the state's at-torney, "without paying any money." [5] However, Williams denied that this jailhouse advice ever included any information about his right to appointed appellate counsel or the critical thirty-day time limit.

Undoubtedly confused by the conflicting advice of his private and jailhouse attorneys, Williams wrote to Sanders as late as May 21; [6] Sanders, true to form, never responded. At a state *coram nobis* hearing held in 1968, Williams testified that by the end of May he had decided to attempt an appeal on his own and did, in fact, prepare his own appeal notices. At that hearing, Williams alleged that his attempts to mail the notices before the June 10th deadline were frustrated by prison officials. Not surprisingly, those officials categorically denied this serious charge; and the *coram nobis* judge, again Justice Marks,

---

vant court rules suggests that any such earlier version was substantially revised in 1967 to take the form quoted above. *See generally*, Rules of the Supreme Court, Appellate Division, First Department, *reproduced in* Civil Practice Annual of New York (1964 through 1967). *But, see*, Leon Polsky, Representation of Defendants, 36 F.R.D. 129, 154 (1964):

> [The First Department has proposed, though not yet adopted, a ruling] that it is the obligation of an assigned counsel to inquire of his client whether or not he wishes to appeal and that he must advise him in writing of his right to appeal, and it is counsel's obligation to file a notice of appeal on behalf of his client if the client so requests.

In any event, whether or not there was such a legal duty on counsel in 1965 is far less important than the fact that there was no such obligation on the courts. Moreover, there is substantial evidence that whatever legal or ethical duty Williams' counsel had to advise his client, he failed to meet it.

2. The state has never contested Williams' indigency. Nor has any question of it been raised in the decisions by Justice Marks and Judge Cooper.

3. The right of an attorney or counsel to withdraw from employment, once assumed, arises only from good cause. Even the desire or consent of the client is not always sufficient. The lawyer should not throw up the unfinished task to the detri-

ment of his client except for reasons of honor or self-respect. . . .
Canon 44, Canon of Professional Ethics.

4. In re John R. Sanders, 28 A.D.2d 31, 280 N.Y.S.2d 934 (1st Dept. 1967), cert. denied, 390 U.S. 1015, 88 S.Ct. 1265, 20 L.Ed.2d 163 (1968).

At the *coram nobis* hearing, the state's attorney informed the court that in the spring of 1968 his office had attempted to secure Sanders as a witness. (He failed to note that Williams had raised his challenge to Sanders' performance as early as 1966, and yet the state apparently made no effort at that earlier time to question the then practicing attorney.)

At one point, the state did succeed in serving Sanders with a summons, but he failed to appear. The district attorney subsequently learned that in July of 1968 Sanders apparently moved to Ohio. The state, having satisfied itself that Sanders was no longer amenable to New York process, then gave up the search.

5. Q. Mr. Williams, you stated, in answer to a question by your lawyer, that at the time you arrived at Sing Sing, about May 12, 1965, two days after sentence, you knew at that time that you could appeal without paying any money? Right?
   A. Right.
   Transcript at 17.

6. Prison records, admitted, at the *coram nobis* hearing, confirm this correspondence.

clearly decided the factual question of official interference against Williams.

In any event, Williams further stated that he did eventually deposit unstamped notice forms in the Sing Sing postal box on June 9, 1965—the day he was transferred from Sing Sing to Attica.[7] He claims that it was not until August of 1965 that he learned—in response to his request for a trial transcript as part of his *pro se* appeal—that no notice forms, timely or otherwise, had ever been received.[8] Since then, Williams has repeatedly attempted to have his right to appeal restored in both the state and federal courts.[9]

For our purposes, the most important of these unsuccessful attempts was the *coram nobis* determination made in 1969. Following an evidentiary hearing held in the fall of 1968, Justice Marks —on April 17, 1969—denied the application in a brief opinion which focused, as did the hearing, on the question of official interference. Justice Marks' only finding with respect to Williams' knowledge of his appellate rights stated:

> Even conceding defendant's indigence, his alleged ignorance of his right to appeal as a poor person was cured when he arrived at Sing Sing

Prison on May 12, 1965. Defendant testified to this at the hearing.

The *coram nobis* judge thus made no specific finding that Williams was ever advised of his right to appointed appellate counsel or of the thirty-day time limit.

After further exhausting his state remedies,[10] Williams brought this habeas petition. In denying the petition without a hearing, Judge Cooper summarized the findings of Justice Marks and, based on the *coram nobis* record, concluded that Williams knew of his appeal rights:

> We find petitioner's failure to appeal either wilful, knowing or the result of his own negligence. He has failed completely to show any deprivation of a constitutional right.

### I.

■ The primary question before us is whether, given all the facts and circumstances of this case, Judge Cooper placed undue reliance on the finding of Justice Marks. However, before we can consider that question, there is a preliminary issue that must be laid to rest: That is, the relevance of the underlying claims petitioner will raise in his state appeal, if his right to appeal is restored.

---

7. At the *coram nobis* hearing, there was substantial conflicting testimony as to the rules regulating correspondence in the New York prisons in 1965. However, despite such allegations of official interference that are likely to emanate from a closed, controlled society, we must assume, as Justice Marks clearly found, that there was no official frustration of Williams' right to appeal.

8. It is undisputed that on July 6, 1965, Williams petitioned for a transcript of his trial. The request was denied on August 5, 1965, on the grounds that Williams had failed to file a timely notice of appeal only four weeks before his transcript request.

9. On May 12, 1966, Justice Marks rejected, as a matter of law, Williams' claim that he had been misled by Sanders.

We think this prior adjudication by the same state judge is significant for three reasons. First, it rebuts any suggestion that Williams fabricated his account of Sanders' malfeasance only after learning of his former counsel's disbarment. In May of 1966,

Sanders was a practicing attorney in New York. Secondly, it suggests that the state's inability to produce Sanders in 1968 was due to its own negligence in not questioning him in 1966 when he was well within the court's jurisdiction. Finally, the 1966 decision is significant in that Justice Marks—citing *Marchese* and *Kling*—clearly embraced the then existing but, as it has now developed, invalid view that only official interference could lead to the restoration of lost appeal rights.

This initial ruling by Justice Marks was subsequently reversed by the Appellate Division, to the extent of granting Williams an evidentiary hearing. People v. Williams, 28 A.D.2d 985, 283 N.Y.S.2d 661 (1st Dept. 1967).

10. Justice Marks' decision was affirmed without opinion by the Appellate Division, People v. Williams, 34 A.D.2d 619, 310 N.Y. S.2d 651 (1st Dept. 1970). On April 24, 1970, leave to appeal to the Court of Appeals was denied.

The state, citing two New York cases involving defendants who had pleaded guilty,[11] suggests that this factor is relevant here. But as this and other federal courts have repeatedly held, the underlying merits have no bearing on the question of restoring fundamental appellate rights where they have been wrongfully denied. United States ex rel. Randazzo v. Follette, 444 F.2d 625, 627–628 (2d Cir. 1971), cert. denied, 404 U.S. 916, 92 S.Ct. 232, 30 L.Ed.2d 191 (1971); United States ex rel. Smith v. McMann, 417 F.2d 648, 654 (2d Cir. 1969) (en banc), cert. denied, 397 U.S. 925, 90 S.Ct. 929, 25 L.Ed.2d 105 (1970); United States ex rel. Singleton v. Woods, 440 F.2d 835, 838 (7th Cir. 1971); Wilbur v. State of Maine, 421 F.2d 1327, 1330 (1st Cir. 1970). Cf. Rodriquez v. United States, 395 U.S. 327, 89 S.Ct. 1715, 23 L.Ed.2d 340 (1969).

■ Conversely, it is, of course, equally true that should the district court determine that petitioner is entitled to have his appeal rights restored, it will in no way reflect on the merits of that appeal. At this juncture, the federal courts are concerned only with the fundamental constitutional question of whether or not Williams was deprived of his rights on appeal—most notably, his right to appointed appellate counsel. Douglas v. California, 372 U.S. 353, 83 S.Ct. 814, 9 L.Ed.2d 811 (1963).

## II.

■ In support of Judge Cooper's reliance on Justice Marks' finding, the state correctly contends that, under 28 U.S.C. § 2254(d)[12] and the Supreme Court's decision in LaVallee v. Delle Rose, 410 U.S. 690, 93 S.Ct. 1203, 35 L.Ed.2d 637 (1973), the habeas court must accord such prior state findings great weight. See also, United States ex rel. Cole v. Mancusi, 429 F.2d 61, 65–66 (2d Cir. 1970), cert. denied, 401 U.S. 957, 91 S.Ct. 982, 28 L.Ed.2d 240 (1971); United States ex rel. Liss v. Mancusi, 427 F. 2d 225, 227 (2d Cir. 1970).

■ However, it is equally true that the habeas court must itself insure that the relevant facts were found and that the correct legal standard was applied to them.[13] 28 U.S.C. § 2254(d)(1, 3, 6–8);

11. People v. Spencer, 32 N.Y.2d 446, 346 N. Y.S.2d 225, 299 N.E.2d 651 (1973); People v. Lynn, 28 N.Y.2d 196, 204–205, 321 N. Y.S.2d 74, 80–81, 269 N.E.2d 794 (1971). In the case at bar, conviction was after trial, and we have no occasion to consider the extent to which a guilty plea may be held to waive any rights.

12. 28 U.S.C. § 2254(d):
In any proceeding instituted in a Federal court by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination after a hearing on the merits of a factual issue, made by a State court of competent jurisdiction in a proceeding to which the applicant for the writ and the State or an officer or agent thereof were parties, evidenced by a written finding, written opinion, or other reliable and adequate written indicia, shall be presumed to be correct, unless the applicant shall establish or it shall otherwise appear, or the respondent shall admit—
(1) that the merits of the factual dispute were not resolved in the State court hearing;
      *      *      *      *      *

(3) that the material facts were not adequately developed at the State court hearing;
      *      *      *      *      *
(6) that the applicant did not receive a full, fair, and adequate hearing in the State court proceeding; or
(7) that the applicant was otherwise denied due process of law in the State court proceeding;
(8) or unless that part of the record of the State court proceeding in which the determination of such factual issue was made, pertinent to a determination of the sufficiency of the evidence to support such factual determination, is produced as provided for hereinafter, and the Federal court on a consideration of such part of the record as a whole concludes that such factual determination is not fairly supported by the record. . . .

13. There cannot even be the semblance of a full and fair hearing unless the state court actually reached and decided the issues of fact tendered by the defendant. Thus, if no express findings of fact have been made by the state court, the District Court must initially determine whether the

Townsend v. Sain, 372 U.S. 293, 312–319, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963). It is only where "it can scarcely be doubted" that the relevant factual issues have been resolved against the petitioner *and* that "there is no evidence that the state trier utilized the wrong [legal] standard," that § 2254 requires the habeas court to dismiss a subsequent petition without an independent evidentiary hearing. LaVallee v. Delle Rose, 410 U.S. 690, 692, 695, 93 S.Ct. 1203, 35 L.Ed.2d 637 (1973).

Here we believe that the state judge —through absolutely no fault of his own —did not focus, and did not make specific findings, on factual questions which have subsequently emerged as critical to petitioner's case. As a matter of law, logic, and reality, there were three distinct pieces of information that Williams—concededly an indigent—needed to effectuate his right to appeal:

1. That he could appeal *in forma pauperis*.

2. That he could obtain appointed appellate counsel.

3. That he had to file his appeal within thirty days.

In determining whether Justice Marks meant to attribute each of these separate pieces of information to Williams in his cryptic finding that Williams knew he could appeal "as a poor person," we must remember some relatively important dates in New York legal history.

First, as noted above, we must recall that when Williams was sentenced in 1965, no New York judge would have thought himself obligated to advise a convicted defendant of his rights to appeal *in forma pauperis* and to appointed

appellate counsel. In 1965, if that obligation existed at all, it resided with the trial attorney. Indeed, in 1964, the New York Court of Appeals had even refused to restore the appellate rights of defendants whose counsel had promised, yet failed, to file timely notice. People v. Marchese, 14 N.Y.2d 695, 249 N.Y.S.2d 888, 198 N.E.2d 916 (1964); People v. Kling, 14 N.Y.2d 571, 248 N.Y.S.2d 661, 198 N.E.2d 46 (1964).

Such was the law in 1965 when Williams was tried and sentenced; and such was the law in the fall of 1968 when his *coram nobis* hearing was held. Since, in the fall of 1968, only a finding of official interference would restore lost appeal rights, it is not surprising that Williams pinned his hopes on such a claim. Indeed in the fall of 1968, Williams' lack of knowledge and the malfeasance of his attorney were largely irrelevant.

However, on February 27, 1969—four months after the completion of the *coram nobis* hearing, but two months before Justice Marks' opinion—the New York Court of Appeals overturned Marchese and Kling. People v. Callaway, 24 N.Y.2d 127, 299 N.Y.S.2d 154, 247 N.E.2d 128 (1969). And, in a companion case, People v. Montgomery, 24 N.Y.2d 130, 299 N.Y.S.2d 156, 247 N.E. 2d 130 (1969), the court put the burden of advising defendants of their appeal rights squarely on the state:

> *The time has come for us to announce clearly that every defendant has a fundamental right to appeal his conviction and that, accordingly, basic fairness and due process require that the right not be dissipated either because the defendant was unaware of its existence or counsel failed to abide*

---

state court has impliedly found material facts. No relevant findings have been made unless the state court decided the constitutional claim tendered by the defendant on the merits.

. . . If the state court has decided the merits of the claim but has made no express findings, it may still be possible for the District Court to reconstruct the findings of the state trier of fact either because his view of the facts is plain from

his opinion or because of other indicia. In some cases this will be impossible, and the Federal District Court will be compelled to hold a hearing.

Reconstruction is not possible if it is unclear whether the state finder applied correct constitutional standards in disposing of the claim.

Townsend v. Sain, 372 U.S. 293, 313–314, 83 S.Ct. 745, 757–758, 9 L.Ed.2d 770 (1963).

*by a promise to either file or prosecute an appeal.* This determination in no way indicates that courts should or can attempt to second guess counsel. Our decision, very simply, demonstrates a fundamental concern that defendants be informed of their right to appeal, and that, where an attorney, whether assigned or retained, fails to apprise his client of his vital privilege, there is no justification for making the defendant suffer for his attorney's failing.

The same result is required if this defendant's claim is analyzed in terms of equal protection.

Since the State has provided an absolute right to seek review in criminal prosecutions it constitutionally follows that an indigent defendant cannot be deprived of this review simply because of his poverty. The condition precedent to appellate review of a criminal prosecution is the filing of a notice of appeal. It is apparent that the 30-day period in which an appeal must be docketed is a critical time for the defendant. It cannot be successfully argued that an indigent defendant does not have the right to counsel at this stage of his proceedings.

It is not clear that, at the time this defendant was convicted, there was any positive obligation imposed on assigned counsel to inform defendants of their right to appeal. Presently, the rules of the Appellate Divisions do provide such an obligation.

*Even with this obligation, however, we do not believe that an indigent defendant can lose his right to appeal simply because the State delegates its responsibility to a member of the Bar to pass along the requisite information. The courts are the surrogates of the State's responsibility in this field. An indigent defendant cannot lose his right to appeal simply because the courts have deputized a lawyer to fulfill the function and he has failed properly to carry out his duties.*

The petitioner, because of his indigency, was compelled in this case to accept the assistance of court-appointed counsel. He claims his counsel did not inform him of his right to appeal. Without such advice this petitioner, who had no previous experience with the law, could not be expected to file a notice of appeal. *There is no question that the primary duty of furnishing legal advice to indigent defendants is a State responsibility.* Either by permitting assigned counsel's role to terminate at the end of trial, or failing to provide safeguards against lack of information, the State permitted a critical time period to lapse of which the defendant was unaware. Since, this lack of awareness occurred because of the defendant's poverty, he must be accorded a hearing to determine whether in fact no one informed him of his right to appeal.

24 N.Y.2d 130, 132–134, 299 N.Y.S.2d 156, 159–161, 247 N.E.2d 130, 132 (1969) [citations omitted; emphasis added].

We have quoted *Montgomery* almost *in toto* not only for what it says, but also to demonstrate what it does not say. Most notably, it does not hold that, as part of their responsibility to an indigent with private counsel, a trial court must advise such a defendant of his right to different, appointed appellate counsel. And it is, therefore, quite reasonable to assume that when, in April of 1969, Justice Marks found that Williams knew he could appeal "as a poor person," the state judge did not intend to imply any finding that Williams further knew of his right to appointed appellate counsel. It was not until October 10, 1969— some six months after Justice Marks' decision—that this court declared that even in 1965 the State of New York had been obligated, as a necessary consequence of Douglas v. California, 372 U.S. 353, 83 S.Ct. 814, 9 L.Ed.2d 811 (1963), to insure that every indigent defendant was informed of his right to appointed appellate counsel. In United States ex rel. Smith v. McMann, 417 F.2d 648 (2d Cir. 1969) (en banc), cert. denied, 397 U.S.

925, 90 S.Ct. 929, 25 L.Ed.2d 105 (1970), we stated:

> We think the only practical, logical and fair interpretation to be given to Douglas v. California is that it imposes upon the state a duty to warn every person convicted of crime of his right to appeal and his right to prosecute his appeal without expense to him by counsel appointed by the state, if he is indigent. The right to appeal at the expense of the state is mere illusion if the convicted indigent defendant does not know such a right exists. And the one way to make sure that he does know is to tell him so.

*Id.* at 654.

Moreover, we were careful to hold in *Smith* that even the presence of retained counsel did not remove this burden from the state:

> We need not inquire, nor is it of any relevance to the decision of this appeal, whether the prisoner's counsel, retained or assigned, was competent or not competent, or whether he thought the appeal if taken would be successful or dismissed as frivolous. We are dealing here with the duty of the State of New York to afford constitutional protection to the prisoner.

*Id.* at 655.

It is against this backdrop of the changing law that we must decide whether it can realistically be said that Justice Marks' brief finding that Williams knew he could appeal "as a poor person" necessarily implies that Williams also knew he had a right to appointed appellate counsel. For as this court stated in *Smith*, the right to proceed *in forma pauperis* and the right to appointed counsel are distinct:

> Thus the critical findings in this case must be: Was [the defendant] indigent at the time he was sentenced by the New York State court? And, was [the defendant] informed or did he know prior to the expiration of his time to appeal that he could appeal without cost to himself *and* with counsel appointed by the state?

*Id.* at 655. [emphasis added]

First, it must be noted that an appeal "as a poor person" is roughly the linguistic equivalent of an appeal *in forma pauperis*. Yet as suggested in *Smith*, the right to appeal without paying normal court fees is something very different from the further right to a free attorney.

Were this linguistic equivalence our only evidence that the state *coram nobis* finding encompasses no more than the right to appeal *in forma pauperis*, we might permit the broader interpretation that Williams also knew of his right to appointed counsel. But. in the finding itself, there is unmistakable evidence that such a broader interpretation is incorrect. For the sake of clarity, let us repeat exactly what Justice Marks found:

> Even conceding defendant's indigence, his alleged ignorance of his right to appeal as a poor person was cured when he arrived at Sing Sing Prison on May 12, 1965. *Defendant testified to this at the hearing.*

[emphasis added].

However, a careful review of the *coram nobis* record indicates that while Williams did testify that he had been advised that he could appeal "without paying any money," he had, on cross-examination, categorically denied that this information had included his right to appointed appellate counsel:

> Q. Are you telling this Court that you understood in May of 1965, that the only lawyer that you could have as your lawyer was Mr. Sanders?
>
> Mr. Feldman: Objection, your Honor. It is argumentative.
>
> The Court: I will let him answer. Is that what you understood?
>
> \* \* \* \* \* \*
>
> A. I didn't understand anything, to tell you the truth.
>
> Q. You didn't understand anything?
>
> A. I didn't understand anything.

Q. Were you aware of the existence, in May of 1965, of the Legal Aid Society?

A. I wasn't.

Transcript at 53–54.

Of course, Justice Marks was not bound to accept Williams' account. But the fact that the state judge explicitly based his finding on Williams' own testimony—together with the fact that *Smith* did not articulate the rule on advising defendants of their right to appointed appellate counsel until after Justice Marks' decision—certainly suggests that he did not intend his finding to include timely knowledge of the right to counsel.[14] Similarly, Justice Marks made no finding that Williams knew of the thirty-day time limit—again, despite Williams' clear testimony that he did not.[15]

■ In sum, we believe that there is substantial doubt that the state judge here, unaware of a legal standard yet to be announced, made any finding adverse to the petitioner on the critical questions of whether he had timely knowledge of his right to appointed appellate counsel or of the thirty-day time limit. We must, therefore, remand to the district court for an evidentiary hearing on these unresolved issues.

■■ In so doing, we wish to note that only in a relatively small number of cases will a prisoner be able to raise a credible claim that he was not advised of his right to free appellate counsel. Since Smith v. McMann, the trial courts have routinely so advised convicted defendants at the time of their sentencing.[16] And even before *Smith,* the rules of practice and legal ethics raise a clear presumption that a defendant with ethical counsel was given such advice. Here, of course, petitioner's testimony and the subsequent disbarment of his attorney rebut that presumption and put the burden on the state to show that, as Smith v. McMann requires, the indigent petitioner knew, yet waived, his fundamental right to appointed appellate counsel.[17] If the state cannot meet this

14. A source undoubtedly before Justice Marks provides further evidence that he intended the phrase "appeal as a poor person" to mean nothing more than the right to appeal in *forma pauperis*: In its opinion reversing his initial decision on Williams' *coram nobis* petition, the Appellate Division used the phrase "right to appellate review as a poor person" to refer to the right to proceed *in forma pauperis.* People v. Williams, 28 A.D.2d 985, 283 N.Y.S.2d 661, 662 (1st Dept. 1967).

This narrow focus is further confirmed by an exchange between the state's attorney and Justice Marks immediately after Williams testified to the limited information provided by his jailhouse lawyer.

MR. SAWYER: Well, at this time, your Honor, I would ask that, either by stipulation or by direction of the Court, that the writ of error coram nobis being brought by this defendant be denied, in view of the fact that the issue, as defined by the Court of Appeals, was the defendant's indigence *and his ignorance of his right to proceed in forma pauperis.*

\* \* \* \* \*

THE COURT: I will not make that finding at this time. I will wait until the entire hearing is over.

Transcript at 17–18 [emphasis added].

15. Though on remand the district court is certainly free to infer awareness of some time limit from Williams' frantic efforts to file an appeal, we nevertheless believe that the court should make a specific finding on whether Williams knew of the deadline sufficiently early to perfect his appeal. *See,* Fox v. State of North Carolina, 266 F.Supp. 19, 21 (E.D.N.C.1967):

A defendant who is not aware that there is a time limit within which notice of appeal must be given may find himself in no better position than the defendant who is completely unaware that he has a right of appeal.

*See also,* Nelson v. Peyton, 415 F.2d 1154, 1157–58 (4th Cir. 1969), cert. denied, 397 U.S. 1007, 99 S.Ct. 1235, 25 L.Ed.2d 420 (1970); Victor v. Lane, 394 F.2d 268, 270–271 (7th Cir. 1968).

16. Indeed, the very purpose of the *Smith* rule was to avoid the necessity of conducting the type of evidentiary hearing that must be held here. *See,* United States ex rel. Smith v. McMann, 417 F.2d 648, 654 n. 7 (2d Cir. 1969) (en banc), cert. denied, 397 U.S. 925, 90 S.Ct. 929, 25 L.Ed.2d 105 (1970).

17. On appeal, the state has argued that once a court makes the minimal finding that a defendant had knowledge of his appellate

burden, the district court must act to restore petitioner's right to appeal.[18]

Reversed and remanded for further proceedings in accordance with this opinion.

MULLIGAN, Circuit Judge (dissenting):

The majority here holds that the New York State *coram nobis* proceeding is not dispositive because the judge who

rights, it need not inquire as to why he failed to exercise them. Since we find that here there was not even such . a minimal finding of knowledge of the specific right to appointed appellate counsel, we need not consider this matter directly. We wish to note, however, that other courts conducting the type of inquiry the district court will hold on remand have looked to a number of factors—most notably, the experience of the defendant with criminal procedure and the eventual timing of his appeal—in determining whether the initial failure to appeal constituted a "knowing and intelligent" waiver. *Compare*, Bartley v. Commonwealth of Kentucky, 462 F.2d 610, 611 (6th Cir. 1972), cert. denied, 409 U.S. 1062, 93 S.Ct. 570, 34 L.Ed.2d 515 (1972); United States ex rel. O'Brien v. Maroney, 423 F.2d 865, 867–872 (3d Cir. 1970) *with* Nelson v. Peyton, 415 F.2d 1154, 1158 (4th Cir. 1969), cert. denied, 397 U.S. 1007, 99 S.Ct. 1235, 25 L.Ed. 2d 420 (1970).

18. The dissent's suggestion that Williams should be remanded to the state courts for further exhaustion of his state remedies deserves some comment. First, it should be noted that far from raising the exhaustion requirement before either this or the district court, the state has emphatically maintained that Williams has pursued every conceivable state remedy in attempting to have his appeal rights restored. In his affidavit to the district court, counsel for the state swore that "Williams has already exhausted his present contention in numerous, repetitive state court proceedings." This averment, which referred the court to *"at least* six, separate state court proceedings," is significant, since exhaustion is not jurisdictional and may therefore be waived where the state is willing to litigate the petitioner's claim in federal court. Tolg v. Grimes, 355 F.2d 92, 97 (5th Cir. 1966), cert. denied, 384 U.S. 988, 86 S.Ct. 1887, 16 L.Ed.2d 1005 (1966); Hines v. Baker, 422 F.2d 1002, 1004 n. 1 (10th Cir. 1970); Jenkins v. Fitzberger, 440 F.2d 1188, 1189 (4th Cir. 1971).

Secondly, apart from this waiver, we believe that Williams has sufficiently exhausted his state remedies. The dissent cites six cases for the proposition that after a significant change in criminal constitution law, the state courts must be given an opportunity to reconsider their rejection of a prisoner's prior petition. But each of these decisions is inapposite because in each the fundamental change in the law occurred well after the final consideration by the state courts. Pennsylvania ex'rel. Raymond v. Rundle, 339 F.2d 598 (3rd Cir. 1964); Blair v. California, 340 F.2d 741, 743–744 (9th Cir. 1965); United States ex rel. Walker v. Fogliani, 343 F.2d 43, 45 (9th Cir. 1965); United States ex rel. Sloan v. McMann, 415 F.2d 275, 276 (2d Cir. 1969); James v. Copinger, 428 F. 2d 235, 241–242 (4th Cir. 1970); Donlavey v. Smith, 432 F.2d 940, 941 (5th Cir. 1970). Here, by contrast, Justice Marks' decision was affirmed by the Appellate Division—and further review by the New York Court of Appeals was denied—some six months after *Smith* clarified the applicable legal standard.

Finally, it must be remembered that the exhaustion doctrine will not be invoked where it would result in a fundamental injustice. *See, e. g.,* Thomas v. Cunningham, 335 F.2d 67, 69–70 (4th Cir. 1964); United States ex rel. Graham v. Mancusi, 457 F.2d 463, 468 (2d Cir. 1972). It seems appropriate to note that Williams has already spent eight years in fairly constant litigation in seeking no more than his right to appeal. The one state review at issue here took more than four years. Furthermore, it must also be remembered that under New York law the mere consideration of a second *coram nobis* petition based on substantially similar grounds is a matter entrusted to the trial judge's discretion. People v. Mazzella, 13 N.Y.2d 997, 245 N.Y.S.2d 6, 194 N.E.2d 835 (1963); People v. Sullivan, 4 N.Y.2d 472, 176 N.Y.S.2d 316 (1958); N.Y.Crim. Pro. Law § 440.20(3) (1970).

Thus, if we send Williams back to the state courts, we may be asking him to spend additional years litigating his right to file a second *coram nobis* petition in order to seek the restoration of his right to appeal his conviction. In view of the fact that Williams has already done everything he could to assert his claim in the state courts, we think such an order "might well invite the reproach that it is the prisoner rather than the state remedy that is being exhausted." United States ex rel. Kling v. LaVallee, 2 Cir., 306 F.2d 199, 203 (Friendly, J., concurring).

conducted the evidentiary hearing and wrote the opinion applied the wrong constitutional standard. The majority says that, in the fall of 1968, the state of the law in New York was such that "only a finding of official interference would restore lost appeal rights;" that Williams therefore "pinned his hopes" on his claim that prison officials interfered with his right to appeal; and that Williams' "lack of knowledge [of his appeal rights] and the malfeasance of his attorney" were largely irrelevant. Hence, the majority concludes that Justice Marks did not focus on the factual questions now in issue since they only emerged as critical subsequently, with the issuance of our opinion in United States ex rel. Smith v. McMann, 417 F. 2d 648 (2d Cir. 1969) (en banc), cert. denied, 397 U.S. 925, 90 S.Ct. 929, 25 L. Ed.2d 105 (1970). The argument runs that since the proper constitutional standard had not been articulated until after the state hearing and after the opinion of Justice Marks was filed, our state court brother could hardly have been able to apply it. If the majority is correct in this position, then I submit that the proper relief in this case is a dismissal of the petition rather than a remand to the district court for a further evidentiary hearing. This is so because if the majority is correct in its analysis, the state court did not have a "fair opportunity" to consider the constitutional defect, and petitioner has thus not exhausted his state remedies. Picard v. Connor, 404 U.S. 270, 276, 92 S. Ct. 509, 30 L.Ed.2d 438 (1971); United States ex rel. Nelson v. Zelker, 465 F.2d 1121 (2d Cir.), cert. denied, 409 U.S. 1045, 93 S.Ct. 544, 34 L.Ed.2d 497 (1972).

In Blair v. California, 340 F.2d 741 (9th Cir. 1965), the basis of petitioner's claim was, like that of petitioner Williams here, that his rights with respect to assigned counsel on appeal of his conviction in the state court had been denied. Blair had raised this claim in his state proceedings, but his contention had been rejected. In the federal habeas proceeding, Blair relied on Douglas v. California, 372 U.S. 353, 83 S.Ct. 814, 9 L.Ed.2d 811 (1963), the seminal case which held that indigent defendants have a right to assigned counsel on appeal. Since Douglas was decided after the denial of his state claim, the circuit court held that his constitutional right to counsel had not been passed on by the state court, that he therefore had not exhausted his state remedies and that if he did not proceed within 90 days in the state court, his petition should be dismissed. This doctrine has been recognized in a number of other cases. See Donlavey v. Smith, 432 F.2d 940 (5th Cir. 1970) (per curiam); James v. Copinger, 428 F.2d 235 (4th Cir. 1970); United States ex rel. Sloan v. McMann, 415 F.2d 275 (2d Cir. 1969); United States ex rel. Walker v. Fogliani, 343 F. 2d 43 (9th Cir. 1965); Comment, Habeas Corpus—Effect of Supreme Court Change in Law on Exhaustion of State Remedies Requisite to Federal Habeas Corpus, 113 U.Pa.L.Rev. 1303 (1965). In Pennsylvania ex rel. Raymond v. Rundle, 339 F.2d 598 (3rd Cir. 1964) (per curiam), the court stated the basis upon which this doctrine rests:

[A] decent regard for the position and responsibilities of the state courts requires that they be afforded an opportunity to consider and decide these questions before the federal district court is called upon to do so.

Id. at 599.

The circuit court there simply dismissed the petition without conditions. The same result is mandated here if the majority thesis is sound.

If, on the other hand, the issue of Williams' knowledge or lack of knowledge of the thirty-day time limitation and the right to free counsel was squarely placed before the state court, I do not think that my brothers have here accorded the state court decision the respect to which it is entitled.

In Townsend v. Sain, 372 U.S. 293, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963), the Supreme Court stated that "the coequal responsibilities of state and federal judges

in the administration of federal constitutional law are such that we think the district judge may, in the ordinary case in which there has been no articulation [of the governing legal standard], properly assume that the state trier of fact applied correct standards of federal law to the facts, in the absence of evidence . . . that there is reason to suspect that an incorrect standard was in fact applied." Id. at 314–315, 83 S.Ct. at 758 (footnote omitted). The Court's recent reversal of this court in LaVallee v. Delle Rose, 410 U.S. 690, 93 S.Ct. 1203, 35 L.Ed.2d 637 (1973) (per curiam) emphasizes our obligation to recognize the state courts as coequal and not inferior tribunals.

It is necessary to inquire as to what evidence my brothers in the majority find to overcome the presumption that the state court recognized the proper standard to be applied. The first claim is that the state court could not have known the proper standard because our opinion in *Smith* had not as yet been published. However, as we have pointed out, this mandates dismissal of the petition. Even if that were not so, I do not think that *Smith* is controlling here. The history of the right of the indigent to free counsel from *Douglas* to *Smith* is set forth in the majority opinion. It was not until *Smith* that a federal court held that, as a necessary corollary of *Douglas*, the State of New York had the obligation, even in 1965, to advise an indigent client of his right to assigned counsel. However, the New York Court of Appeals in People v. Montgomery, 24 N.Y.2d 130, 299 N.Y.S.2d 156, 247 N.E.

2d 130 (1969), in the words of the majority, put the burden of advising defendants of their appeal rights squarely on the state. This case was decided after the state coram nobis proceeding in this case but two months before Justice Marks rendered his opinion. Since it was a sharp departure from the prior practice of the state courts, which had placed the onus on trial counsel to advise convicted indigent defendants of their appellate rights, we must assume that the case did not escape the attention of an experienced state trial judge who was then bound to advise defendants of their rights to appeal as indigents. The majority, however, says that *Montgomery* "does not hold that, as part of their responsibility to an indigent with private counsel, a trial court must advise such a defendant of his right to different, appointed appellate counsel." Since this precise proposition was not before the Court of Appeals, it was of course not "held," but I cannot accept the conclusion that it was not necessarily implicit in the holding of the state court.

The Rules of the Appellate Division, First Department, in effect when Justice Marks rendered his decision and when he conducted the evidentiary hearing, specified that it was the obligation of trial counsel, *retained or assigned* to advise a defendant who was unable to pay the cost of an appeal of his rights to apply for leave to appeal as a poor person.[1] *Montgomery* shifted that burden from counsel to the court. I cannot assume that the burden on the court was any less than that which had been on

---

1. The Rules of the Appellate Division, First Department provided as follows:

(b) *Notification of right to appeal.* (1) *After conviction and sentence.* Where there has been a conviction after trial or otherwise . . . it shall be the duty of counsel, *retained or assigned,* and of the public defender, immediately after the pronouncement of sentence or the service of a copy of the order disposing of the application in the nature of a writ of error coram nobis or a writ of habeas corpus, to advise the defendant in writing of his right to appeal, the time limitations involved, the manner of instituting an appeal and of obtaining a transcript of the testimony, *and of the right of a person who is unable to pay the cost of an appeal to apply for leave to appeal as a poor person.* It shall also be the duty of such counsel to ascertain whether defendant wishes to appeal and, if so, to serve and file the necessary notice of appeal.

22 New York Codes, Rules & Regs. § 606.5 (1968) (emphasis added).

counsel, and, therefore, the state court would have known that Williams was entitled to be advised of his right to free assigned counsel whether he had retained counsel on trial or not. The right of a defendant to be advised of his right to appeal as a poor person obviously does not depend upon some presumption that, since he could afford to retain trial counsel, he could afford appellate counsel and was stuck with him on appeal.[2] The distinction here proffered is too precious, and I cannot accept that *Montgomery* can reasonably be interpreted so academically. Judge Friendly, in his dissenting opinion in *Smith*, observed:

> Today's ruling may not be of great practical importance with respect to New York prisoners in light of Judge Keating's sweeping language in People v. Montgomery . . . which the majority applauds.

417 F.2d at 659.

In any event, the State here does not contend that Williams was ever advised by the court or by counsel of his right to appeal as an indigent. The claim is made that, either at the detention center in New York City or at Sing Sing Prison, he was so advised by jailhouse lawyers and that therefore he knew of his rights. *Smith* makes it abundantly clear that the critical question in cases such as this is "was [the defendant] informed or *did he know* prior to the expiration of his time to appeal that he could appeal without cost to himself and with counsel appointed by the state?" 417 F.2d at 655 (emphasis added). See also United States ex rel. Roldan v. Follette, 450 F. 2d 514, 516 (2d Cir. 1971); United States ex rel. Witt v. LaVallee, 424 F.2d 421, 423–24 (2d Cir. 1970) (en banc). *Douglas* held that the indigent defendant had the right to free counsel on appeal, and, while *Montgomery* and *Smith* held that the obligation to advise the indigent rests on the State, the position of

the State here is that, if in fact Williams knew that he had the right to free counsel, the question of whether or not he was officially advised is irrelevant.

To establish that Justice Marks did not focus on Williams' right to free counsel on appeal, the majority emphasizes the last sentence of the pertinent portion of his opinion. He held that Williams' ignorance of his right to appeal as a poor person was cured when he arrived at Sing Sing Prison on May 12, 1965. The court stated: "Defendant testified to this at the hearing." But, says the majority here, Williams denied at his state evidentiary hearing that he knew he could have any counsel on appeal other than his retained trial counsel. Reference is then made to the *coram nobis* hearing, in which Williams did testify: "I didn't understand anything, to tell the truth." Justice Marks, who not only had the opportunity to observe the defendant at the evidentiary hearing, but also was the judge at trial, during which Williams was independently identified as a rapist by four of his victims, obviously had the right to find this testimony incredible. Williams' story that he was denied stamps to mail his notice of appeal was demonstrated to be a total fabrication, and this placed his credibility seriously in doubt. Moreover, the state judge was not required to articulate credibility findings in his opinion. LaVallee v. Delle Rose, *supra*, 410 U.S. at 692, 93 S.Ct. 1203.

Williams further testified that he did know from jailhouse lawyers that he could appeal "without paying any money." The majority interprets this as an admission only that he knew he could appeal without paying court costs. He did know something of significance, therefore, even on the assumption of the majority. Since any prisoner knows that the major and primary cost of an appeal is counsel fees, I cannot agree that his answer is susceptible to the lim-

---

2. As Judge Medina indicated in *Smith*, the only practical method of handling the problem is to require that notification of the right of a poor person on appeal be given to indigents and non-indigents alike. 417 F.2d at 654 n. 7.

ited interpretation of the majority. Justice Marks could well have found that his answer meant what it said, and that when Williams testified that he knew he could appeal without paying money, he meant free counsel as well as free costs. It certainly does not fulfill the petitioner's burden "to establish in the District Court by *convincing evidence* that the state court's determination was erroneous." Lavallee v. Delle Rose, *supra*, 410 U.S. at 695, 93 S.Ct. at 1206 (emphasis added).

The majority's only other evidence that Justice Marks did not address himself to Williams' right to free counsel on appeal is the language of his opinion finding that Williams knew of his right to appeal as "a poor person." This is found to be linguistically equivalent to "*in forma pauperis*," and, it is said, since the broad right to free counsel on appeal was only enunciated in *Smith*, the state court's use of the poor person terminology could not have been intended to indicate a finding that Williams knew his appeal rights had to be exercised within thirty days and included free counsel.[3] This is pure *petitio principii*. *Douglas* had already enunciated the rights of an indigent on appeal and *Montgomery* was the precursor of *Smith*.

Aside from this, the majority must assume that Williams' claim was that he did not know of the time limit or the free appeal (else we must dismiss for lack of state exhaustion of remedies). How can we assume that the *coram nobis* judge did not address himself to those contentions? On the contrary, the following colloquy between Williams' counsel and Justice Marks indicates that he did:

And it is claimed he was denied his constitutional rights to counsel.

And may I further submit that the fact that the defendant may have been informed about certain of his legal rights does not necessarily mean that he knew that he had a right to appeal, that he had a right to appeal as a poor person, and that he had 30 days in which to file a notice of appeal.

THE COURT: Those are the questions which the Court will have to try.

The majority properly insists that as a matter of law, logic and reality, an indigent needs three distinct pieces of information to effectuate his right to appeal:

1) that he could appeal *in forma pauperis*,

2) that he could obtain appointed appellate counsel,

3) that he had to file his appeal in thirty days.[4]

3. While the term "*in forma pauperis*" initially referred only to the right to sue "without liability for costs" (Black's Law Dictionary 895 (Rev. 4th ed. 1968)), the term has assumed a much broader meaning since *Douglas*. Rule 32(a)(2) of our own Rules of Criminal Procedure provides that the court "shall advise the defendant of his right to appeal and of the right of a person who is unable to pay the cost of an appeal to apply for leave to appeal in *forma pauperis*." The rule does not mention free counsel. However, in Johnson v. Norton, 435 F.2d 842, 843 (1st Cir. 1970), the court said: "the trial court did not inform [defendant] of his right of appeal from his conviction and, if indigent, to court-appointed counsel, as required by Fed.R.Crim.P. 32(a)(2)." In *Smith*, Judge Medina stated that the New York and the federal rules "do no more than implement what we think was at all times

implicit in the landmark case of Douglas v. California." 417 F.2d at 655. *Douglas* held that the appointment of counsel on appeal for the indigent was constitutionally mandated. *Montgomery* and *Smith* simply put the onus on the state to so advise the indigent. As we have pointed out, that is not in contention here. The State only claims that Williams knew of this right.

4. The majority position that Justice Marks made no finding that Williams knew of the thirty-day time limit is not substantial, as footnote 15 suggests. If Justice Marks found, in the view of the majority, that Williams knew that he did have the right to appeal without costs, it must have been obvious that that information was totally worthless if he was unaware that he had to exercise this right in timely fashion. A specific finding to this effect is not necessary.

I totally agree. It is so clearly logical that it could not have escaped the attention of the state court.[5]

I respectfully dissent.

Townsend v. Sain, *supra*, 372 U.S. at 314, 83 S.Ct. 745. Further, in *Montgomery* Judge Keating had emphasized the importance of the time question:

> The condition precedent to appellate review of a criminal prosecution is the filing of a notice of appeal. It is apparent that the 30-day period in which an appeal must be docketed is a critical time for the defendant. It cannot be successfully argued that an indigent defendant does not have the right to counsel at this stage of his proceedings (see Hamilton v. Alabama, 368 U.S. 52, 82 S.Ct. 157, 7 L.Ed.2d 114).

24 N.Y.2d at 133, 299 N.Y.S.2d at 160, 247 N.E.2d at 132.

5. With respect to the argument in footnote 18 of the majority opinion: I agree that Williams made largely the same contentions in the state court as he makes here in the federal courts, although they were of course all made prior to *Smith*. The holding of the majority, however, that the *coram nobis* court did not apply the proper federal constitutional criterion since it had not yet been articulated, prompted the counter-argument that the petition should therefore be dismissed for failure to exhaust. If the majority's position is that the affirmance of the *coram nobis* decision by the Appellate Division and the denial of review by the Court of Appeals were post-*Smith* and therefore meaningful, then the argument that the state court could not have applied the proper constitutional criterion evanesces. It must be assumed on this theory that the New York appellate courts considered that the *Smith* criteria had been applied and were satisfied. The majority cannot have it both ways. *Haec reputent, videbunt.*