Craig FOWLER, Charles Jordan and Larry Johnson, Petitioners-Appellants,

v.

A. R. JAGO, Superintendent, Respondent-Appellee.

No. 80–3583.

United States Court of Appeals, Sixth Circuit.

Argued April 15, 1981.

Decided July 20, 1982.

Rehearing and Rehearing En Banc Denied Oct. 7, 1982.

Richard L. Aynes, Appellate Review Office, School of Law, Akron, Ohio, for petitioners-appellants.

William J. Brown, Atty. Gen. of Ohio, Simon Karas, Asst. Atty. Gen., Columbus, Ohio, for respondent-appellee.

Before EDWARDS, Chief Judge, ENGEL, Circuit Judge, and GILMORE,* District Judge.

* Honorable Horace W. Gilmore, Judge, United States District Court for the Eastern District of Michigan, sitting by designation.

GILMORE, District Judge.

Habeas petitioners, Craig Fowler, Charles Jordan, and Larry Johnson, with Asa Harris, were indicted by a Cuyahoga County Grand Jury on 33 counts charging them with kidnapping, aggravated burglary, aggravated robbery, and attempted aggravated murder. After a lengthy jury trial in the Court of Common Pleas, petitioners were found guilty of six counts of the indictment: the aggravated burglary and robbery of Andrew Johnson, the aggravated burglary of Judy Winegardner, the aggravated burglary of Catherine O'Brien, the attempted aggravated murder of patrolman William Beranek, and the attempted aggravated murder of Sergeant Richard Spahr. Asa Harris, who had asserted an alibi defense, was acquitted. Substantial sentences were imposed on petitioners.

Circumstances underlying the charges are bizarre. In the evening of May 29, 1974, petitioners forced their way into the home of Judy Weingardner in East Cleveland. Inside were Andrew "School Boy" Jackson and several others. At gun point, everyone was forced to lie down on the floor, and the petitioners proceeded to take money, jewelry, clothing, and household appliances from the home. They loaded all of this material into two automobiles, one belonging to Jackson and the other belonging to petitioner Fowler. All the victims were tied up, except for Jackson and a small child, who were forced into one of petitioners' cars.

Petitioners then drove to Jackson's home, which was also in East Cleveland. Upon entering it, they took money, jewelry, guns, and other items that apparently belonged to Jackson. One of the occupants of Jackson's home was able to telephone the police, who responded to the call. Meanwhile, petitioners started to leave the Jackson home, taking Jackson with them. Jackson, however, broke free and ran to the police, whereupon defendants fled on foot and eventually

broke into the home of a family named O'Brien. An extensive police search of the area was commenced and finally focused on O'Brien's house where the petitioners were hiding. When two officers went to the door, one of the occupants told the police that the men they were looking for had been there but had left. The police, however, remaining suspicious, asked if they could search the house. Upon entering the doorway, the police heard someone inside shout that the defendants were inside. The officers tried to run off the porch but rifle fire from the house forced them to take cover. Two other officers, approaching the O'Brien home by automobile, were hit with rifle fire.

The area was quickly saturated with police. The ensuing gun battle lasted nearly an hour and several police officers were wounded. The home was tear gassed, and petitioners eventually fled, taking some of the O'Brien family with them. Two of the O'Briens were shot and wounded. It is not clear who fired the shots, but petitioners assert the police fired the shots hoping to kill petitioners. Fowler, Jordan, and Johnson were arrested around 1:00 a. m. on the morning of May 30 and taken to the East Cleveland Police Station. All were booked and interrogated throughout the morning. Johnson apparently made an oral statement between 4:30 a. m. and 7:00 a. m., and Johnson and Fowler gave oral and written statements some time between 4:00 a. m. and 7:00 a. m.

The petitioners' version of the events differ substantially from those of the Prosecution. Petitioners claim first that "School Boy" Jackson was a known drug pusher and they had gone to visit Jackson to convert him to their Sunni Muslim religious faith and to persuade him to cease his drug trafficking. It was their claim that Jackson had voluntarily accompanied the defendants from the first house to his own in order to rid himself of certain guns which he had stored there. As they were preparing to leave, Jackson pushed Fowler and started running towards the police, who began to fire. Petitioners claim that Jackson, with the aid of the police, had set them up in order to eliminate the petitioners and to protect his narcotic business, which they claimed he operated with the benefit of paid police protection. It was their claim that the exchange of gun fire which occurred in the evening was initiated by the police, and that they had originally fled from the area and sought refuge at the O'Brien house in fear of their lives. They insisted that they at all times believed that the police were in league with Jackson and that, at Jackson's instigation, the police were determined to set up and eliminate the petitioners.

Petitioners exhausted all appeals and now appeal the District Court's denial of their several petitions for writ of habeas corpus filed under 28 U.S.C. § 2254. They raise seven issues on appeal, but one, the admissibility of confessions made by the petitioners, is dispositive, and requires reversal and remand to the District Court for a hearing on the voluntariness of the confessions.

Petitioners claim that they were abused, both mentally and physically, and thus the confessions which were received into evidence were the product of coercion. The police dispute the allegations of abuse. These is clear evidence from photographs that defendants Fowler and Johnson suffered injuries between approximately 1:00 a. m., at the time of their arrest, and 4:00 to 5:00 a. m., when photographs were made. The police admit that injuries occurred, but state that they occurred during arrest scuffles.

Although it is lengthy and tedious, we must look at the conflicting testimony of the parties to resolve the issue. We start with petitioner Jordan. He testified that he was hit with a gun, struck in the face with the butt of a shotgun, and subjected to racial slurs and profanity shortly after he arrived at the police station. He says that upon arriving at the station he was taken to a room where he was beaten. Later, he was booked and taken to a cell. After about 15 minutes, he was removed for questioning and taken back to this cell. He states that Officer Bayerl was largely re-

sponsible for his beating. Jordan also testified that he saw Officer Bayerl strike petitioner Fowler with a shotgun; breaking the handle of the gun.

Petitioner Johnson says he was abused at the time of his arrest. He testified that the police tried to break his arm, stepped on his hands, kicked him, hit him in the stomach with a shotgun butt, and threatened him. He claims that during the ride to the station, he was hit in the head with a blackjack and in the face with a pistol and a flashlight. While entering the station, he states that his head was rammed into a steel door. He further claims that he was beaten after he got into the station, that a gun was put in his mouth, that an officer spit upon him, and that he was told he would be denied medical attention until after a statement was made. It is undisputed that he suffered injuries to his right eye, had a chipped tooth, and was taken to the hospital several hours after his arrest and received seven stitches in his head. He claims several officers were responsible for his mistreatment.

Petitioner Fowler claims that he was beaten and choked at the arrest scene, and that a cigarette was put out on his leg. He states that he was beaten in the police station with a blackjack, and that a shotgun handle was broken across his jaw. He further claims he saw Jordan being beaten at the station, and that threats were made against his family during the interrogation process.

Mrs. Larry Johnson testified on behalf of the petitioners and said she was not permitted to see her husband until four days after his arrest. When she finally saw him he had a black eye, stitches over his eyebrow, and blood clots around his eye.

In addition to the above testimony, it is undisputed that the petitioners were the subjects of a tear gas bombardment which necessitated medical treatment for some individuals present at the scene. The petitioners received no medical attention prior to their interrogation.

The time sequence of all of the alleged beatings is not totally clear. Petitioners were arrested around 1:00 a. m. and were then taken to the East Cleveland Police Station where they were booked and placed in single-man cells. Formal interrogation seems to have started around 3:00 a. m., and confessions were obtained between 4:30 a. m. and 7:00 a. m.

The police officers' versions of the events dispute most of the petitioners' claims. Officer Staimpel, Bayerl, and Freshwater, among others, testified that they did not abuse the petitioners. The facial marks and bruises observed on petitioners Jordan and Johnson were explained as the product of legitimate encounters at the time of arrest, or at the station house. For example, while Officer Horval admits that he pushed petitioner Johnson against a steel door at the station, he claims he did it to prevent Johnson from escaping.

The transcript of the state court's evidentiary hearing does not explain the injuries received by petitioner Fowler. Not only do some of Fowler's allegations remain undisputed, the various officers presented conflicting testimony regarding Fowler's arrest and interrogation. There is nothing in the record disputing the allegation that Fowler, as well as the other two petitioners, was suffering from the effects of tear gas at the time of his interrogation. Officer Copeland testified that he first saw Fowler around 4:30 a. m.; he acknowledged that Fowler had already been interrogated. Copeland stated that he took a written statement from Fowler at about 7:30 a. m. Copeland said that Fowler had a cut on his face and was suffering from the effects of tear gas. Copeland admitted that it is possible that Fowler had a black eye, was bruised around the nose, and had a broken and bleeding nose. He admitted that the police probably hit the petitioners.

Officer Farmer's testimony does not coincide with that of Officer Copeland. Farmer testified that he interrogated Fowler for about 45 minutes at 3:30 a. m. while Officers Copeland and Dugan were present. Farmer said that he noted nothing unusual about Fowler's appearance. He claims that Fowler voluntarily agreed to give an oral statement, but would not give a written statement without a lawyer.

The record also reveals undisputed events surrounding petitioner Johnson's arrest which could indicate that his confession was not voluntary. For example, Officer Look took a statement from Johnson at 4:15 a. m. and admitted that Johnson had a cut over his right eye. Look acknowledged that Johnson was later taken to the hospital. It is not clear from the testimony on the record how this injury occurred. Officer Horval, Johnson's arresting officer, testified that Johnson was knocked to the ground during apprehension. Horval stated that Johnson suffered a bruised head. Officer McIntosh, who helped remove Johnson from the shoot-out scene, testified that he noticed injuries to Johnson's eye before Johnson got in the car. However, McIntosh stated that, if his testimony conflicted with Horval's, he (McIntosh) was mistaken. Officer Kaminski, who interrogated Johnson around 4:00 a. m., said Johnson may have had a puffed eye.

Finally, it was undisputed that petitioner Johnson was stripped naked in the presence of a police woman.

In the face of these highly disputed facts and contradictory testimony, the state trial judge made only the following findings at the conclusion of the hearing: "With respect to the motion to suppress the statements, I find the statements were voluntarily given and were not given because of threats, coercion, and abuse." No further findings were made.

The statements were admitted at trial, and petitioners were tried and found guilty, as indicated above. Substantial prison sentences were imposed and all state appeals were exhausted.

Petitioners then filed a habeas corpus petition in the United States District Court for the Northern District of Ohio. Judge Thomas, after reviewing the record made in the state court, denied the petition without an evidentiary hearing, concluding that the state court's determination was fairly supported by the record. We find that the district judge erred in relying on the conclusions of the state trial judge, and that this matter must be reversed and remanded to Judge Thomas for a testimonial hearing by him on the voluntariness and admissibility of the confessions involved.

■ Federal courts reviewing state criminal convictions on writs of habeas corpus have broad power to hold *de novo* evidentiary hearings. *Townsend v. Sain*, 372 U.S. 293, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963). The decision to hold an evidentiary hearing is, in many cases, within the sound discretion of the trial judge. In certain situations, however, the exercise of the federal court's power to try the facts anew is mandated. In *Townsend, supra*, the Supreme Court held that "a federal evidentiary hearing is required unless the state court trier of fact has after a full hearing reliably found the relevant facts." 372 U.S. at 312–13, 83 S.Ct. at 756–57. The Court further held that an evidentiary hearing must be granted under the following circumstances:

> "If (1) the merits of the factual dispute were not resolved in the state hearing; (2) the state factual determination is not fairly supported by the record as a whole; (3) the fact-finding procedure employed by the state court was not adequate to afford a full and fair hearing; (4) there is a substantial allegation of newly discovered evidence; (5) the material facts were not adequately developed at the state court hearing; or (6) for any reason it appears that the state trier of fact did not afford the habeas applicant a full and fair fact hearing."

372 U.S. at 313, 83 S.Ct. at 757.

■ Thus, in order to eliminate the need for an independent federal evidentiary hearing, the district court must examine the findings of the state court to determine whether the state trier of fact reliably found the material facts and rejected the claim on its merits. In some situations, where the state court has not articulated express findings, it may be possible for the federal court to reconstruct the findings of the state trier of fact. If these findings can be inferred from the record, the federal court need not hold its own evidentiary hearing.

■ In 1966, three years after the decision in *Townsend*, Congress codified a good part of the *Townsend* holding in 28 U.S.C. § 2254(d),[1] Act of November 2, 1966, 80 Stat. 1105. Although on its face the statute does not govern when a federal court must hold an independent evidentiary hearing,[2] it does require that state court findings of fact made after a full and fair hearing are entitled to a presumption of correctness. If the findings of the state court meet the indicia outlined in § 2254(d), the state court determination is presumed to be correct. Nevertheless, the presumption and special burden of proof do not operate at all if any one of the eight specified exceptions to the statute exists. These eight exceptions appear to subsume the six *Townsend* criteria. Thus, the determination that one of the six *Townsend* criteria exists necessarily resolves the § 2254(d) burden of proof issue. If one of the *Townsend* criteria is present, the district court must hold an evidentiary hearing and the presumption of correctness does not apply. Conversely, if the presumption is operative, an evidentiary hearing cannot be mandated.

Under both *Townsend* and § 2254(d), therefore, the district court must conduct an inquiry into whether the state court has adequately resolved the factual issues contained in the petitioner's constitutional claim.

In *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), at 323, the Supreme Court defined the broader duties of federal courts in dealing with state habeas cases. It said:

"The federal habeas corpus statute presumes the norm of a fair trial in the state court and adequate state postconviction remedies to redress possible error. . . . *What it does not presume is that these state proceedings will always be without error in a constitutional sense.* The duty of a federal habeas corpus court to appraise a claim that constitutional error did occur—reflecting as it does the belief that the 'finality' of a deprivation of liberty through the invocation of the criminal sanction is simply not to be achieved at the expense of a constitutional right— is not one that can be so lightly abjured." (emphasis added)

This language provides a succinct explanation of the role § 2254(d) plays in collateral view of constitutional error in state court findings of fact. It clearly points up the constitutional need for federal courts to know that state court findings are reliable.

■ Federal courts have an obligation to ascertain whether the state court found the relevant facts and applied the correct standard of law. As pointed out in *United States ex rel. Williams v. LaVallee*, 487 F.2d 1006 (2d Cir. 1973):

"[T]he habeas court must itself insure that the relevant facts were found and that the correct legal standard was applied to them. [cites omitted] It is only where 'it can scarcely be doubted' that the relevant factual issues have been resolved against the petitioner *and* that 'there is no evidence that the state trier utilized the wrong legal standard' that § 2254 requires the habeas court to dismiss a subsequent petition without an independent evidentiary hearing." (emphasis in original)

*Id.* at 1010–11.

■ Thus, this court must examine the findings of the state judge to determine if

---

1. 28 U.S.C. § 2254(d) provides that in any habeas corpus proceeding a determination after hearing on the merits of a factual issue made by a state court of competent jurisdiction, evidenced by a written finding, or other reliable or adequate written indicia, will be presumed to be correct. There are eight exceptions to the presumption of correctness, including a finding that the merits of the factual dispute were not resolved by the state court hearing or that the factual determination of the state court was not fairly supported by the record.

2. In the dissent to *LaVallee v. Delle Rose*, 410 U.S. 690, 701 n.2, 93 S.Ct. 1203, 1209 n.2, 35 L.Ed.2d 637 (1972), Justice Marshall says, " . . . [T]he question whether such a hearing is appropriate on federal habeas corpus continues to be controlled exclusively by our decision in *Townsend v. Sain* even after the enactment of § 2254(d). See Developments in the Law— Federal Habeas Corpus, 83 Harv.L.Rev. 1038, 1141 (1970). . . . "

they are adequate to support the presumption of correctness under § 2254(d). These findings must be sufficient to enable the district court to fulfill its obligation to determine that they are supported by the evidence and that the correct standards of law were applied. The federal district court may dismiss the petition without a hearing only if the findings of the state judge are sufficient to enable the federal district judge to determine that they are supported by the evidence and that the correct standards of law were applied.

In *LaVallee v. Delle Rose*, 410 U.S. 690, 93 S.Ct. 1203, 35 L.Ed.2d 637 (1973), the Supreme Court discussed the adequacy of the state court's findings under 28 U.S.C. § 2254(d).[3] In *LaVallee*, the respondent's conviction for murder was based on two confessions that were found to be voluntary in subsequent New York state court proceedings. The state court heard testimony and, after an extensive summary of the evidence, concluded:

> "On all the evidence, both at the trial and at the hearing and after considering the totality of the circumstances, including the omission to warn defendant of his right to counsel and his right against self incrimination, I find and decide that the respective confessions to the police and district attorney were, in all respects, voluntary and legally admissible in evidence at the trial ..."

410 U.S. at 691, 93 S.Ct. at 1204.

In subsequent federal habeas proceedings, the district court felt unable to accord the state court the presumption of correctness because the state trial judge did not articulate to what extent he credited or rejected the respondent's testimony. The district court held its own hearing, found the confession involuntary, and ordered the respondent discharged unless he was retried. The Court of Appeals affirmed on the ground that the state court's factual determination on voluntariness did not meet the standards of 28 U.S.C. § 2254(d).

The United States Supreme Court reversed in a five to four opinion, holding that the state trial judge's determination of the totality of the circumstances evidenced that he had applied correct voluntariness standards. The Court further noted that since the district court could have been reasonably certain that the state trial judge would have granted relief if he had believed respondent's testimony, the federal courts erroneously concluded that the opinion of the state trial court did not meet the requirements of § 2254(d)(1).

In *LaVallee*, the petitioner relied primarily on his own testimony to prove involuntariness, and ended up contradicting his own claims. The state presented evidence directly refuting the petitioner's allegations. The Supreme Court's opinion says, in essence, that the district court was required to assume that the state court had found that the petitioner's allegations were incredible. This assumption was based on the theory that the state court would have granted relief if it had decided to believe the petitioner, since there was every indication that the state trial judge applied the correct standards.

■ Although *LaVallee* emphasizes that federal courts must, in general, defer to the determination of the state trier of fact and assume that the state trier correctly resolved the facts, such an assumption is not warranted in all cases. In *Townsend, supra*, the Court anticipated the situation we face here.

> "If the state court has decided the merits of the claim but has made no express findings, it may still be possible for the District Court to reconstruct the findings of the state trier of fact, either because his view of the facts is plain from his opinion or because of other indicia. In some cases this will be impossible, and the Federal District Court will be compelled to hold a hearing.

**3.** As indicated above, state court findings must meet the same standards under both *Townsend* and § 2254(d).

"Reconstruction is not possible if it is unclear whether the state finder applied correct constitutional standards in disposing of the claim. Under such circumstances the District Court cannot ascertain whether the state court found the law or the facts adversely to the petitioner's contentions. Since the decision of the state trier of fact may rest upon an error of law rather than an adverse determination of the facts, a hearing is compelled to ascertain the facts. Of course, the possibility of legal error may be eliminated in many situations if the fact finder has articulated the constitutional standards which he has applied.

\* \* \* \* \* \*

Unless the district judge can be reasonably certain that the state trier would have granted relief if he had believed petitioner's allegations, he cannot be sure that the state trier in denying relief disbelieved these allegations. If any combination of the facts alleged would prove a violation of constitutional rights and the issue of law on those facts presents a difficult or novel problem for decision, any hypothesis as to the relevant factual determinations of the state trier involves the purest speculation. The federal court cannot exclude the possibility that the trial judge believed facts which showed a deprivation of constitutional rights and yet (erroneously) concluded that relief should be denied. Under these circumstances it is impossible for the federal court to reconstruct the facts, and a hearing must be held."

372 U.S. 314 through 316, 83 S.Ct. 757 through 759.

Thus, *Townsend* clearly indicates that the district court's ability to infer factual findings and the deference accorded state court decisions depends upon the facts of the individual cases.[4] Indeed, the Court in *LaVallee* indicated the same standard when it said:

"Under these circumstances, we think the District Court could have been reasonably certain that the state court would have granted relief if it had believed respondent's allegations."

410 U.S. at 695, 93 S.Ct. at 1206.

■ As noted above, *LaVallee* indicates that the district court must accept the findings and conclusions of the state judge only if it "can scarcely be doubted" that the state court resolved all relevant factual issues against the petitioner and if "there is no evidence that the state trier utilized the wrong standards." 410 U.S. at 692, 695, 93 S.Ct. at 1204, 1205. *See United States ex rel. Williams v. LaVallee*, 487 F.2d 1006, 1011 (2d Cir. 1973).

The state judge's findings in the instant case cannot meet these exacting standards. The findings are conclusory and do not give assurance that the trier of fact applied the correct standards of law. Moreover, in contrast to *LaVallee*, the facts in the instant case do not mandate the assumption that the state court judge believed the police because he found that the confessions were voluntary. The question here is not just one of the petitioners' credibility; rather, there is undisputed evidence that could indicate coercion, as well as an admission by the prosecutor that the petitioners "were not treated gently."[5]

The testimony offered by the police was often contradictory and did not totally refute petitioners' claims. For example, Offi-

---

4. We are well aware that the opinion in *Townsend* states: "Thus, if third-degree methods of obtaining a confession are alleged and the state court refused to exclude the confession from evidence, the district judge may assume that the state trier found the facts against the petitioner, the law being, of course, that third-degree methods necessarily produce a coerced confession." 372 U.S. at 315, 83 S.Ct. at 758. The problem in this case is that we do not know, because of the complexity of the record, that the state court necessarily found the facts against the petitioner.

5. It is important to remember that the interrogation in this case took place under volatile and emotional circumstances. The petitioners were apprehended after a gun battle which lasted at least one hour and involved extensive tear gas bombardment, the wounding of two police officers and the wounding of two civilians.

cer Copeland conceded that Fowler had probably been struck. He also conceded that Fowler's face showed evidence of some trauma. A comparison of pictures taken of Fowler at the time of his arrest with identification photos at the station indicates that Fowler's face sustained some type of blow. These pictures and the testimony of Officer Copeland remain entirely unexplained.

Even if we assume that the state judge resolved all factual disputes against the petitioners, we still are faced with unexplained events that could possibly render the confessions involuntary. This indicates that the state court either did not resolve the merits or failed to apply the proper standard. Did the state court find, for example, that there was coercion and physical violence, but that the confessions were still voluntary? Or, did it conclude that no coercion was used against petitioners? If it reached the latter conclusion, the findings would be clearly erroneous, for there is clear evidence on the record indicating that force and coercion were used against petitioners, particularly with reference to Fowler. This court cannot evaluate the appropriateness of the state court's conclusion because the state trial judge has given no indication that he applied the appropriate legal standard. The factual disputes in this case are so frequent and so dramatic that they call for specific credibility resolution by a judge.

Here we do not know the basis for the findings of the state court. This case is not like LaVallee, where the findings of the state court could be easily inferred because of a clear-cut conflict in testimony. The conflict here cannot be resolved by believing one witness against another. The fact situation presents far too many relevant conflicts in testimony.

Since we cannot determine the basis for the state court's conclusion, we are of the opinion that the district judge should not have accorded the state trial judge's findings a presumption of correctness, but should have held an evidentiary hearing. The need for such a hearing is compelled by the failure of the state trial judge to articulate the legal standard applied in making the determination of voluntariness, or the factual findings upon which it was based in light of the complex facts of this case.[6]

In reaching this conclusion, the court is cognizant of its responsibility to state reasons for concluding that one or more of the factors listed in § 2254(d) are present. *Sumner v. Mata*, 449 U.S. 539, 101 S.Ct. 764, 66 L.Ed.2d 722 (1981). We believe that the long reiteration of the questions raised by the testimony at the state court hearing fulfills this obligation.

Nor is the court unmindful of the admonition of the Supreme Court in its most recent decision in the *Sumner* case. *Sumner v. Mata*, —— U.S. ——, 102 S.Ct. 1303, 71 L.Ed.2d 480 (1982). We are fully aware that the underlying facts as found by the state court are governed by a statutory presumption of correctness. As stated in *Sumner II*, we are bound to defer to the state court's findings of fact, "unless one of the factors listed in § 2254(d) is found." *Sumner v. Mata, supra,* at ——, 102 S.Ct. at 1307. After a review of the facts in this case, we find that the state court failed to resolve the merits of the factual dispute as required by § 2254(d)(1).

■ This court cannot determine the basis for the state trial judge's decision, and, we, therefore, cannot assume that the state trial judge did not reach an erroneous decision. The district court cannot infer findings and assume the proper standard was applied because the findings cannot be reconstructed from an examination of the record. Where findings cannot be inferred, and where there has been no articulation of the standards used by the state trier of

---

6. In reaching this conclusion, we are not unaware of *Berry v. Cowan*, 497 F.2d 1274 (6th Cir. 1974). There the Court found that the state court demonstrated that proper constitutional standards had been met. Here the rec-

fact, the district court must hold its own hearing.[7]

Further, the ultimate question as to the constitutional admissibility of the confession in this case is a mixed question of fact and law that is not governed by § 2254. The Supreme Court, in *Sumner v. Mata, supra,* said:

"We agree with the Court of Appeals that the ultimate question as to the constitutionality of the pretrial identification procedures used in this case is a mixed question of law and fact that is not governed by § 2254. In deciding this question, the federal court may give different weight to the facts as found by the state court and may reach a different conclusion in light of the legal standard."

—— U.S. at ——, 102 S.Ct. at 1306–07.

Therefore, for the reasons given, this case is remanded to the district court for the purpose of holding a full testimonial hearing as to the admissibility of the confessions and making findings of fact and law thereupon. This court retains no further jurisdiction. Reversed and remanded.

ENGEL, Circuit Judge, dissenting.

The unusual nature of the occurrences set out in the majority opinion and the fact that several police officers were injured during the affray have required us all to scrutinize the record of the trial proceedings with exceptional care. Under the recited circumstances the potential for an excessive response by the police is all too real, even in the best regulated law enforcement agencies. While I therefore have great respect for the views expressed by the majority, I must nevertheless dissent.

I would affirm the decision of United States District Judge William K. Thomas because both he and the state trial court have in my judgment complied with the requirements of 28 U.S.C. § 2254 and of *Townsend v. Sain,* 372 U.S. 293, 83 S.Ct.

745, 9 L.Ed.2d 770 (1963). With those conditions met, it was necessary for Judge Thomas, as it is for us, to respect the finality of the state court factual determinations in a criminal case over which the state court possessed original jurisdiction.

On May 29, 1974, petitioners were involved in a violent altercation with the police in which several policemen and two other citizens were injured by gunfire. Following their arrest, petitioners were taken to the police station where each confessed. Prior to trial, the state court held an evidentiary hearing regarding the admissibility of petitioners' confessions. This hearing lasted three days, included the testimony of eighteen witnesses (the three petitioners, the wives of petitioners Johnson and Jordan, and thirteen policemen), and generated over 600 pages of transcript and a number of photographic exhibits. These witnesses presented conflicting testimony. The petitioners testified that they had been subjected to physical abuse and threats by the police. The officers testified basically that any injuries which occurred were a result of force needed to arrest petitioners, that petitioners were not abused or threatened at the station, and that petitioners' statements were voluntary.

At the conclusion of the lengthy suppression hearing, the trial court ruled:

I find the statements were voluntarily given and were not given because of threats, coercion and abuse.

Transcript at 662. The state trial judge did suppress a written statement made by petitioner Fowler because he found that statement, although otherwise voluntary, had been made after Fowler requested counsel. With the other confessions admitted, petitioners were convicted by a jury of six counts involving charges of aggravated burglary and attempted aggravated murder.

On appeal in the state system, the Eighth District of the Ohio Court of Appeals af-

---

ord does not show that proper constitutional standards were met.

**7.** We do not suggest that the conclusion of the state trial judge was wrong. We do not know.

What was wrong was his failure to give articulated reasons for his conclusions in a case in which it was not obvious why he reached his conclusions.

firmed the trial court judgment. That court found petitioners' claim that their confessions were involuntary to be without merit. In so holding it observed that it had examined pictures taken of petitioners following interrogation and that "[t]he photographs of the [petitioners] do not demonstrate they had been beaten as the injuries were minor and insignificant." *Ohio v. Fowler*, No. 34287, slip op. at 4 (Ohio Ct. App. Dec. 11, 1975). Petitioners' motions for leave to appeal to the Supreme Court of Ohio were denied.

Petitioners filed petitions for writs of habeas corpus in district court. Judge Thomas, after noting that he had read the entire record, observed:

> The testimony of the police witnesses was diametrically opposed to that of petitioners with respect to the issues of "deception and physical and mental coercion."
>
> \* . \* \* \* \* \*
>
> Whether petitioners in this case were subjected to verbal and physical abuse and whether their confessions were the product of any such abuse, are factual issues that were fully and fairly litigated in the trial court at the hearing in which petitioners were represented by counsel. Therefore, under 28 U.S.C. § 2254(d), the finding of the state court that the petitioners' confessions were not the product of abuse or coercion is presumed to be correct unless that "factual determination is not supported by the record." . . . This court having considered as a whole that part of the record pertinent to the issue of coercion, finds that the state court's determination is fairly supported by the record.

*Fowler v. Jago*, Nos. C79–64, C79–65, C79–66, mem. op. at 7–8 (N.D.Ohio June 16, 1980). The petitions were accordingly denied.

Now, more than eight years after the events which gave rise to petitioners' convictions, the majority ruling orders a remand to the district court for a second evidentiary hearing to determine the voluntariness of certain statements made by petitioners after they were arrested on the night of the crimes. That hearing must necessarily be held after the memories of the witnesses have become faded and probably jaded by time, assuming they can be located. The majority so holds although there is not the slightest suggestion in the comprehensive record before us, to paraphrase 28 U.S.C. § 2254, that the fact-finding procedures employed by the state court, which spread over many days and covered more than 600 pages of trial transcript, were inadequate to afford a full and fair hearing; nor that the material facts were not adequately developed at the state court hearing, as shown so clearly by the extended statement of facts in the majority opinion; nor that the state court lacked jurisdiction in the state criminal proceedings; nor that the petitioners were denied counsel, when it is clear that both the state and the petitioners were fully and ably represented by competent, aggressive, well-prepared counsel; nor that the applicants received anything short of a full, fair, and adequate hearing in the State court proceedings; nor that the petitioners were otherwise deprived of due process in the state court proceedings; nor, finally, that the factual determinations by the state trial judge were not fairly supported by the record in the state court proceedings.

None of the foregoing observations, based upon 28 U.S.C. § 2254 and upon the language of *Townsend v. Sain*, is seriously disputed by the majority. Instead, it predicates its remand to the district court for a new and supposedly improved evidentiary hearing solely upon its conclusion that, in the language of 28 U.S.C. § 2254(d)(1), "the merits of the factual dispute were not resolved in the State court hearing." It so holds because it finds inadequate the determination of the state trial judge that the statements which were allowed into evidence at the trial "were voluntarily given and *were not given because of threats, coercion or abuse.*" (emphasis added).

I read the majority opinion to hold that the district judge committed two errors. First, the majority concludes that it was improper to apply a presumption of correct-

ness to the state court findings on voluntariness. Second, it finds that the district court should have held an evidentiary hearing instead of relying on an evaluation of the state court record.[1] In so ruling, the majority concludes that the factual finding of the state trial judge on voluntariness was not entitled to the section 2254(d) presumption of correctness because of "the failure of the state trial judge to articulate the legal standard applied in making the determination of voluntariness, or the factual findings upon which it was based in light of the complex facts of this case." Majority Op. at —— (footnote omitted).

In my opinion, a proper respect for the teachings of *LaVallee v. Delle Rose*, 410 U.S. 690, 93 S.Ct. 1203, 35 L.Ed.2d 637 (1973), and *Townsend v. Sain*, and for the Congressional mandate of 28 U.S.C. § 2254,

justifiably requires us to uphold the decision of the district judge denying habeas relief.

Congress carefully provided in 28 U.S.C. § 2254(d)[2] for a presumption of correctness of factual findings made after a hearing by a state court of competent jurisdiction. Section 2254(d) commands that these factual findings "shall" be presumed correct unless any one of eight specific circumstances should exist. Clearly, the statute admonishes federal courts to be respectful of the integrity of their sister courts in the states and of the coequal ability of state courts to protect the constitutional rights of persons accused of crime.

In *LaVallee v. Delle Rose*, the Supreme Court considered and rejected arguments nearly identical to those relied upon by the majority here. Delle Rose had been con-

---

**1.** Significantly, petitioners' brief in this court does not assign as error any failure of the district court to hold a new hearing. Instead, the brief states that "the district court erred in relying upon the 'findings' of the state court with respect to the voluntariness of [petitioners'] alleged statements and failing to make an independent determination upon those issues." Appellants' Brief at p. 11. Petitioners argue that the district court had a duty to make an independent evaluation of the state court record, but there is no mention of a need for a new hearing or for additional evidence.

**2.** 28 U.S.C. § 2254(d) provides:

In any proceeding instituted in a Federal court by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination after a hearing on the merits of a factual issue, made by a State court of competent jurisdiction in a proceeding to which the applicant for the writ and the State or an officer or agent thereof were parties, evidenced by a written finding, written opinion, or other reliable and adequate written indicia, shall be presumed to be correct, unless the applicant shall establish or it shall otherwise appear, or the respondent shall admit—

(1) that the merits of the factual dispute were not resolved in the State court hearing;

(2) that the factfinding procedure employed by the State court was not adequate to afford a full and fair hearing;

(3) that the material facts were not adequately developed at the State court hearing;

(4) that the State court lacked jurisdiction of the subject matter or over the person of the applicant in the State court proceeding;

(5) that the applicant was an indigent and the State court, in deprivation of his constitutional right, failed to appoint counsel to represent him in the State court proceeding;

(6) that the applicant did not receive a full, fair, and adequate hearing in the State court proceeding; or

(7) that the applicant was otherwise denied due process of law in the State court proceeding;

(8) or unless that part of the record of the State court proceeding in which the determination of such factual issue was made, pertinent to a determination of the sufficiency of the evidence to support such factual determination, is produced as provided for hereinafter, and the Federal court on a consideration of such part of the record as a whole concludes that such factual determination is not fairly supported by the record:

And in an evidentiary hearing in the proceeding in the Federal court, when due proof of such factual determination has been made, unless the existence of one or more of the circumstances respectively set forth in paragraphs numbered (1) to (7), inclusive, is shown by the applicant, otherwise appears, or is admitted by the respondent, or unless the court concludes pursuant to the provisions of paragraph numbered (8) that the record in the State court proceeding, considered as a whole, does not fairly support such factual determination, the burden shall rest upon the applicant to establish by convincing evidence that the factual determination by the State court was erroneous.

victed in New York state court of the premeditated murder of his wife. Two confessions were admitted into evidence after having been found voluntary. On appeal, the New York Court of Appeals directed the trial court to hold a special hearing on voluntariness, after which the trial court summarized the evidence and concluded:

> On all the evidence both at the trial and at the hearing, and after considering the totality of the circumstances, including the omission to warn defendant of his right to counsel and his right against self-incrimination, *I find and decide that the respective confessions* to the police and district attorney *were, in all respects, voluntary and legally admissible* in evidence at the trial....

(emphasis added). The trial court made no further findings. In subsequent habeas corpus proceedings, the district court held that because the state trial judge had failed to explain precisely how far he credited the defendant's testimony as well as other evidence before him, there was no "adequate" factual determination within the meaning of section 2254(d). The district court then held its own hearing and thereafter found the confessions to be involuntary.

In affirming, the Second Circuit stated that while New York's state judges were competent and willing to apply the rules on the admissibility of confessions,

> we cannot tell in this instance whether the New York courts credited Delle Rose's story of the circumstances surrounding his confessions but still held these to have been voluntary, a conclusion to which we could not agree, or based their holding of voluntariness on a partial or complete rejection of his testimony....

*United States ex rel. Delle Rose v. LaVallee*, 468 F.2d 1288, 1290 (2d Cir. 1972), *rev'd*, 410 U.S. 690, 93 S.Ct. 1203, 35 L.Ed.2d 637 (1973).

The Supreme Court reversed. A majority of the Court concluded that the opinion of the trial court met the requirements for the presumption of correctness of section 2254(d). The Court relied on language from *Townsend v. Sain* to hold that where a trial judge refuses to exclude a confession in the face of allegations of "third-degree" methods of interrogation by the police in a habeas proceeding " 'the district judge may assume that the state trier found the facts against the petitioner....' " *LaVallee v. Delle Rose, supra*, 410 U.S. at 694, 93 S.Ct. at 1205. The Court also stated there was "no evidence that the state trier utilized the wrong standard...." 410 U.S. at 695, 93 S.Ct. at 1205. Therefore, the finding of the state trial court on voluntariness was entitled to the presumption of correctness from 28 U.S.C. § 2254(d), and Delle Rose had the burden "to establish in the District Court by convincing evidence that the state court's determination was erroneous." *Id.*

Similarly, in the present case, the trial judge had to decide whether to believe the petitioners or the police. As Judge Thomas stated: "there was conflicting testimony about whether petitioners were subjected to physical and verbal abuse. Resolution of this issue was largely a matter of credibility." *Fowler v. Jago*, Nos. C79–64, C79–65, C79–77, *supra* at 8. After an extensive hearing, which the majority has not challenged as to its fairness or completeness, the trial judge resolved the factual questions against petitioners. Not only did he find the confessions to be voluntary, as did the state judge in *LaVallee*, but he also found that they were not made "because of threats, coercion and abuse." This is more precise than the finding made in *LaVallee*.

Significant to me is the absence in the majority opinion, or in the record upon which it is based, of any suggestion that the state trial judge was not fully aware and respectful of the federal constitutional requirements concerning the voluntariness of confessions under the Fifth and Fourteenth Amendments. Indeed, not mentioned in the majority opinion is the fact that the state trial judge suppressed one proffered statement because he found it to violate *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694, 86 S.Ct. at 1613 (1966). It is, therefore, even more reasonable for us, here, to assume that the state trial

judge would have granted relief had he believed the evidence supportive of the petitioners' claim at the suppression hearing. I respectfully suggest that what is characterized by the majority as uncertainty regarding the legal standard employed in state court is simply an honest disagreement with the conclusions which the state trial judge so clearly reached respecting voluntariness. This is not and should not be, in our constitutional system of joint federal-state responsibility, a valid basis for the interposition of the differing views of federal judges.

Although it acknowledges that the "police officers' versions of the events dispute most of the petitioner's claims," Majority Op. at 986, the majority is troubled by inconsistencies found in some testimony of the police. After reading the record, I do not have the same problems. I agree with Judge Thomas that the findings of the state trial judge, though succinct to the point of being terse, are fairly supported by the entire record, judged as a whole.

The inherently intimidating nature of custodial interrogation has been fully catalogued in *Miranda v. Arizona, supra.* While perhaps the frequency of abuse may have diminished in the sixteen intervening years, my own judicial experience confirms the observation of Chief Justice Warren that "[t]he use of physical brutality and violence is not, unfortunately, relegated to the past or to any part of the country." *Id.* at 446, 86 S.Ct. at 1613. Thus the burden is cast upon the government to prove by a preponderance of the evidence the voluntariness of the defendant's confession before it may be used against him at trial. *Lego v. Twomey,* 404 U.S. 477, 92 S.Ct. 619, 30 L.Ed.2d 618 (1972). As noted by Chief Justice Warren in *Miranda,* one of the particularly evil by-products of coercive interrogation is its basic unreliability as evidence of guilt. *See Miranda, supra,* 384 U.S. at 455 n.24, 86 S.Ct. at 1618 n.24. Nevertheless, not all custodial interrogations are invariably coercive in fact, nor are confessions or statements gained during such interrogation invariably involuntary. If they were, they would probably be barred on the basis of unreliability alone.

Human motivation is complex, and the need to explain one's actions may be overwhelming, even though later it may appear to have been unwise. "If it is true that confession is good for the soul, it must be acknowledged that a free and honest admission of guilt is perhaps the first and largest step toward ultimate rehabilitation." *U.S. v. Derrick,* 519 F.2d 1, 4 (6th Cir. 1975).[3]

While I suppose the trial judge could have credited petitioners' story that they were on a peaceful religious mission to "convert" their victim, he could certainly with equal plausibility have concluded that it was patently incredible. They had to be aware that the evidence of their own violent conduct on the evening in question was overwhelming. I believe that the state trial judge was fully entitled to discredit not only their testimony concerning the night's events altogether, but also was entitled to discount the petitioners' description of the causes and extent of their alleged injuries and any impact those events might have had on the voluntariness of their state-

---

**3.** If we are to credit the testimony of Officer Horval, petitioner Johnson's statements could present just such an example. From Horval's testimony, it appears that Johnson was read the *Miranda* warnings upon being placed in the police cruiser and that Johnson stated he understood his rights. Transcript at 195. The officer then told Johnson that two policemen had been shot and asked him why. According to Officer Horval, Johnson responded that "he was after Schoolboy, and there was nothing meant against the police." Transcript at 204. Obviously, Johnson could have been terrified of the police, offering an explanation which he hoped might protect him from a dreaded "third degree" interrogation back at the station. On the other hand, as a purported member of a religious sect, Johnson may have been genuinely surprised at the unusual twist of events. He may even have been regretful that a robbery of someone who he believed was selling drugs had escalated into an invasion of the rights of others toward whom he bore no personal malice whatever. I do not suggest which, if either, explanation is the correct one. I do suggest that the quality of the record and the accuracy of findings based upon it is not likely at this time to be significantly improved, even taking into account the consummate skill and refined judgment which Judge Thomas could be expected to contribute.

ments. Obviously that is exactly what he did. While the majority points to discrepancies in the evidence on behalf of the state, common sense suggests that such discrepancies are typical of the truth-seeking process and may be more supportive of the ultimate finding than unfailing consistency.[4]

To avoid the rule of *LaVallee*, the majority argues that this case is too "complex" for a federal district court to defer to terse state court findings. Essentially, the majority would require specific resolution of credibility conflicts in testimony by a state court before the presumption of correctness of 28 U.S.C. § 2254(d) would arise. This precise argument was made by Justice Marshall when he dissented in *LaVallee*. 410

U.S. at 700, 93 S.Ct. at 1208.[5] That argument, however, failed to persuade a majority of the Court in *LaVallee*. Nothing indicates that the Supreme Court would be more receptive to it today.

The majority suggests that a finding that no coercion was used by the police against the petitioners would be "clearly erroneous." To support this conclusion, the majority points to photographs taken of the petitioners at the time of arrest and to those taken by the police at the station for identification. There is no mention, however, of a finding by the Ohio Court of Appeals that "[t]he photographs of the appellants do not demonstrate they had been beaten as the injuries were minor and insignificant." Under *Sumner v. Mata*, 449 U.S.

4. Although the accounts of the police witnesses varied somewhat as to the time of questioning, the exact questions asked, and petitioners' responses, there was unanimous agreement among the police that petitioners had not been physically abused or threatened at the police station. *See* Transcript at 35, 43, 47 (Officer Copeland testifying that petitioners "didn't get beaten," were not threatened, and were not harmed at the police station); Transcript at 76–77 (Officer Look testifying that petitioner Johnson was not threatened at the station); Transcript at 432 (Officer McIntosh testifying that he did not strike petitioner Johnson with a flashlight while arresting him); Transcript at 512 (Officer Rose testifying that no acts of violence occurred against Fowler or Jordan in the jail); Transcript at 573 (Officer Staimpel testifying that there was no indication that petitioner Jordan had been beaten or suffered facial lacerations); and Transcript at 607 (Officer Bayerl testifying that he did not strike petitioner Jordan and that he saw no one beaten). As the majority notes, the testimony of the police indicated that petitioner Johnson suffered a slight cut and bruise around his right eye as a result of altercations and scuffles during arrest and transportation to the station. The testifying officers differed slightly as to when Johnson suffered the injury, which the Ohio appeals court found to be "minor and insignificant," but their testimony showed no use of unreasonable force such as might cause petitioners' confessions to be involuntary. In no sense did the police substantiate or lend credence to petitioners' versions of events that police beat them with gun butts, pistols and flashlights and threatened them and their families. Had the state judge credited petitioners' allegations, I believe, as the Supreme Court stated in *LaVallee*, "the District Court could have been reasonably certain that the state

court would have granted relief." 410 U.S. at 695, 93 S.Ct. at 1206.

Also, I believe that the police testimony regarding the nature of events surrounding petitioners' arrest is adequate explanation of Fowler's minor injuries that are shown in his identification photo. Even if the facts surrounding Fowler's arrest were not sufficiently developed on the record, this would not justify a remand for petitioners Johnson and Jordan as well.

5. In his dissent Justice Marshall stated:

It is possible, of course, that the state court rejected all of respondent's testimony as incredible and therefore properly held the confessions voluntary. On the other hand, if the state court had believed all of respondent's contentions, it would undoubtedly have found the confessions involuntary. There remains, however, the third possibility that the state court believed some of respondent's contentions and rejected others. It is this last possibility that makes for substantial uncertainty in a factually complex case such as this as to whether the state court correctly applied the abstract legal standard and did not, instead, commit constitutional error. Due to the unrevealing nature of the state court's decision, it is impossible to say that that court may not have credited a sufficient portion of respondent's story to establish, under the controlling standard, the involuntariness of his confessions and nevertheless have reached an erroneous conclusion of voluntariness because the question may have been a close one on the facts that it accepted. It is this inherent uncertainty as to what the state court may have believed or disbelieved that justified the action of the District Court and the Court of Appeals in this case.

*LaVallee, supra*, 410 U.S. at 700, 93 S.Ct. at 1208.

539, 546, 101 S.Ct. 764, 768–69, 66 L.Ed.2d 722 (1981) (*Sumner I*), the deference to state factual determinations applies to findings both by state trial and appellate courts. *Sumner I* and *Sumner v. Mata*, —— U.S. ——, 102 S.Ct. 1303, 71 L.Ed.2d 480 (1982) (*Sumner II*), emphasize that a federal court must articulate which factor from section 2254(d) was found if the court refuses to defer to the state court. In disregarding the Ohio appellate court's evaluation of the photographs, the majority here does not indicate that section of 2254(d) upon which it relies.[6]

While I personally do not entertain such a view, it must be observed that on this record a more probative issue could be raised whether *any* statements or confessions, coming in the immediate aftermath of admittedly violent circumstances, could *ever* be voluntary, as a matter of law, no matter how that violence came about or how it may have or have not affected the petitioners when they made their statements. Such a view might arguably hold that upon this record the findings of the state trial judge that the statements were "voluntary, and not given because of threats, coercion or abuse" were "not fairly supported by the record," as provided in section 2254(d)(8). Nevertheless the majority has carefully avoided this conclusion. It implies that somehow if, after a new hearing, the federal district judge reaches the same conclusions but buttresses it with more complete findings concerning credibility and resolution of apparent conflicts in the testimony, the denial of the writ will then be upheld.

The specificity which the majority would impose upon the state judge, as a condition to acceptance of his factual findings, while undoubtedly desirable, far exceeds that held fully adequate in *LaVallee v. Delle Rose* and, I submit, that usually required of trial judges in both state and federal systems. Upon the strength of the majority's opinion,

if it stands, it will not hereafter be difficult to disregard the findings of state trial judges by merely pointing to some conflict in the testimony and holding that it should have been specifically resolved by written findings. We shall then be back where we were before Chief Justice Warren's admonitions of *Townsend v. Sain* were incorporated into section 2254.

I also respectfully disagree with the majority's conclusion here that Judge Thomas erred in not holding a separate evidentiary hearing on the question of voluntariness. In my opinion this result is contrary to the Supreme Court's decision in *Townsend v. Sain*. There the Court emphasized that express findings by a state court judge are not always necessary: "it may ... be possible for the District Court to reconstruct the findings of the state trier of fact, either because his view of the facts is plain from his opinion or because of other indicia." 372 U.S. at 314, 83 S.Ct. at 758. While the Court in *Townsend* did in fact remand for an evidentiary hearing, it also was careful to observe:

> [T]he coequal responsibilities of state and federal judges in the administration of federal constitutional law are such that we think the district judge may, in the ordinary case in which there has been no articulation, properly assume that the state trier of fact applied correct standards of federal law to the facts....
>
> Thus, if third degree methods of obtaining a confession are alleged and the state court refused to exclude the confession from evidence, the district court may assume that the state trier found the facts against the petitioner, the law being, of course, that third-degree methods necessarily produce a coerced confession.

372 U.S. at 314–15, 83 S.Ct. at 757–58. That is precisely the situation here.

There is no suggestion in the majority opinion that the state trial judge who pre-

---

6. In *Sumner II*, the Supreme Court said that the presumption of § 2254(d) does not apply to the ultimate question of the constitutionality of pretrial identification procedures because that is a "mixed question of fact and law." —— U.S. at ——, 102 S.Ct. at 1306. In my opinion, *Sumner II* does not require reversal of Judge

Thomas. In the instant case, the trial court's determination included factual findings as well as the ultimate determination that the statements were "voluntary." Also, the Court in *Sumner II* gave no signal that the validity of *LaVallee* was in doubt.

sided over the case was biased, or not competent to hear the defendants' motions to suppress or to rule upon them intelligently and fairly. While during the evidentiary hearing, the trial judge occasionally expressed some frustration with the aggressive conduct of defendants' counsel, in my judgment, he presided over the hearing in as fair and intelligent a manner as one could reasonably expect in either the federal or the state system. The majority opinion does not suggest otherwise or provide any reason why another hearing, presided over by a federal instead of a state judge, could produce a more just or objective result.[7]

These petitioners have had their day in court. They have been accorded due process in those proceedings and have been found guilty after a fair trial. This litigation should be at rest.

---

7. Because I would not remand this case to the district court for a new hearing, I would reach the other issues presented by petitioners in their appeal. Upon consideration of these issues, I do not believe they provide grounds for reversal of the district court judgment.